```
IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF TEXAS
            FORT WORTH DIVISION

CAREFLITE                        §
                                 §
VS.                              §  CIVIL ACTION NO.4:07-CV-334-Y
                                 §
OFFICE AND PROFESSIONAL          §
EMPLOYEES INTERNATIONAL          §
UNION, AFL-CIO                   §
```

ORDER DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This suit arises out of a collective-bargaining agreement ("CBA") between plaintiff CareFlite and defendant Office and Professional Employees International Union, AFL-CIO ("the Union"), covering CareFlite's helicopter pilots. CareFlite operates the largest helicopter emergency medical-transport service in North Texas. The Union represents the pilots who fly the helicopters. Both parties are seeking a declaratory judgment as to whether, under the CBA, the Union's grievances regarding CareFlite's termination of a helicopter pilot are subject to binding arbitration.[1]

The parties have filed cross motions (docs. ##19 & 39) for summary judgment on the question of whether the Union's grievances are subject to binding arbitration. After review, the Court concludes that they are.

---

[1] CareFlite filed a declaratory-judgment complaint seeking a declaration from the Court that the Union's grievances are not arbitrable. The Union filed an answer and three counterclaims. The Union's first counterclaim also seeks a declaratory judgment from the Court declaring the Union's grievances are subject to binding arbitration. The remainder of the Union's counterclaims are pled in the alternative should the Court rule that the Union's grievances are not subject to binding arbitration.

I.   Background

CareFlite is a non-profit corporation based in Grand Prairie, Texas.[2] It is an air carrier as defined by Section 201 of the Railway Labor Act ("RLA") and is, therefore, subject to the Act's provisions. *See* 45 U.S.C. § 181.  The Union is certified under Section 2, Ninth, of the Act as the pilots' exclusive collective-bargaining representative and is also subject to the provisions of the RLA.  *See* 45 U.S.C. § 151.

Section 2, First, of the RLA, which is applicable to both rail and air carriers, requires all carriers and its employees

> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of the dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First and § 181.  Adhering to that provision, CareFlite and the Union have negotiated and entered into various CBAs.

The first CBA became effective in 2003 and was set to expire in April 2006.  During 2005 and 2006, the parties engaged in negotiations intended to produce a new CBA.  Craig Hilton initially negotiated on behalf of the Union.  Hilton had been a pilot for CareFlite since December 1998.

---

[2] CareFlite's primary mission is to safely transport patients to appropriate medical facilities, including trauma centers.  Since 1979, CareFlite has grown into the largest medical-transportation corporation in the Dallas-Fort Worth area, transporting between 3500 and 4000 patients per year.

In the negotiations, CareFlite sought to include a requirement that its pilots obtain an Airline Transport Pilot Certification ("ATP certification").[3] CareFlite contended the ATP certification would lower its insurance premiums, demonstrate its commitment to safety, and enhance its professional reputation.[4] After much back and forth, the parties agreed to the following provision, which is set out in Article 12, Section 1 of the CBA:

> A pilot is responsible for the costs associated with obtaining additional FAA certifications/licenses. All new hire pilots must possess an ATP in category prior to expiration of probation. Current pilots must possess an ATP in category one (1) year after effective date of this contract or by the second check ride after this contract is signed, whichever is later. A termination of employment resulting from a pilot's failure to obtain an ATP within the time requirements of this section is non-grievable and non-arbitrable.

(Def.'s App. at 59-60.) The parties executed the CBA in April 2006. Hilton was one of the Union signatories to the CBA.

Before the effective date of the 2006 CBA, the parties executed a side letter that supplemented the CBA with respect to the ATP-certification requirement contained in Article 12, Section 1. (Pl.'s App. at 49-50.) In this side letter, CareFlite agreed to schedule and pay for the ATP checkride and to provide a training class at each

---

[3] Pilot certifications are issued by the Federal Aviation Administration ("FAA"). CareFlite's pilots are required to obtain their commercial-pilot certification. The ATP certification is the highest-level certification that a pilot can obtain but it is not required by the FAA.

[4] The Union states that CareFlite promised that the savings from the lower insurance premiums would go to increasing pilots' wages.

3

of its bases. (*Id.*) It also agreed that if the ATP training class was provided after the execution of the CBA, then the one-year period in the CBA for obtaining ATP certification would not begin until the last day of the class. (*Id.*) CareFlite provided the ATP training classes on May 24 and 26, 2006, which was after the CBA became effective, and Hilton attended one of those classes. Thus, pursuant to the side letter, Hilton was required to obtain his ATP certification no later than May 26, 2007.

CareFlite fired Hilton on June 6, 2006, citing misconduct. The Union filed a grievance over the discharge, which eventually went to arbitration. After a two-day hearing, the arbitrator issued his decision wherein he found that CareFlite did not have "just cause" under the CBA to discipline Hilton. (Def.'s App. at 39.) The arbitrator sustained the Union's grievance and ordered Hilton's reinstatement, but also ordered that Hilton "undergo and pass any and all examinations that may be required to re-qualify as a pilot, including physical, mental, and technical proficiency." (*Id.* at 40.)

Hilton was reinstated on May 7, 2007, but he had not obtained his ATP certification. Under the CBA and the side letter, he had until May 26 to obtain it. The Union sent a letter to CareFlite the next day seeking additional time for Hilton to obtain his ATP certification. The Union and Hilton contended that Hilton should be given ten additional months, which is roughly the amount of time

4

Hilton lost due to his unjust discharge. CareFlite rejected the request.

On May 15, the Union filed a grievance complaining of CareFlite's failure to give Hilton adequate time to obtain his ATP certification; complaining of CareFlite's threat to discharge Hilton based on what the Union believed to be an unreasonable application of Article 12, Section 1, of the CBA; and alleging that CareFlite's actions were in retaliation for Hilton's prevailing at the arbitration. The grievance sought to compel CareFlite to give Hilton at least six months to obtain his ATP certification.

By May 26, Hilton had not obtained his ATP certification, so CareFlite immediately terminated his employment under Article 12, Section 1, of the CBA. The Union filed a grievance on June 1 challenging Hilton's discharge. Again, the Union demanded that Hilton's deadline to obtain his ATP certification be extended by at least six months. CareFlite denied both the May 15 and June 1 grievances, contending that its actions under Article 12, Section 1, are non-grievable and non-arbitrable.[5] The Union subsequently submitted an appeal to a System Board of Adjustment (essentially starting the arbitration process).[6] CareFlite subsequently filed

---

[5] CareFlite and the Union have agreed to consolidate the two grievances.

[6] The parties' CBA "established a System Board of Adjustment for the purpose of adjusting and deciding disputes [that] may arise under [the CBA] and [that] may be properly submitted to the System Board of Adjustment . . . ." (Def.'a App. at 74.) The parties' CBA provides that the System Board will have jurisdiction over disputes that arise "out of the interpretation and application" of the CBA or disputes that the CBA expressly states may be referred to the

5

the instant action seeking a declaration from the Court that the System Board lacks jurisdiction over the two grievances.

II. Analysis

   A.   Standard

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In making its determination on the summary-judgment motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). After reviewing the full record, the Court finds that the parties agree as to the material facts that would inform the Court's decision. The parties' dispute is over the arbitrability of the two union grievances. This is a question of law for the Court to decide. *See AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986)("the question of arbitrability . . . is undeniably an issue for judicial determination").

---

System Board for resolution. (Def.'a App. at 74.) The CBA further provides that the System Board

> shall have no jurisdiction whatsoever over proposals or disputes relating to changes in hours of work, rates of pay, rules of working conditions, as they are governed by the [RLA], 45 U.S.C. § 156. The Board has no jurisdiction to modify, add to or otherwise alter or amend any of the terms of this Agreement.

(*Id.*)

B.  Discussion

As mentioned above, the sole issue presented in CareFlite's motion is whether the System Board has jurisdiction to hear and decide the Union's two consolidated grievances.  CareFlite contends it does not because the CBA expressly excludes pilot terminations based on their failure to obtain ATP certification from the grievance and arbitration procedures.

As will be discussed below, CareFlite's position fatally relies on *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986)*.*  In that case, brought under section 301(a) of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), the Supreme Court reiterated that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute [that] he has not agreed so to submit."  *AT&T Tech., Inc.,* 475 U.S. at 648 (internal quotations and citations omitted).  Reciting the language from Article 12, Section 1, CareFlite asseverates that it could not be more "patent that [it] and the Union negotiated a specific arbitration-exclusionary clause applicable to" the dispute surrounding Hilton's discharge for failing to obtain his ATP certification. (Pl.'s Br. at 12.)

CareFlite is correct that the general rule is that arbitration is a matter of contract and that a party cannot be required to submit to arbitration if it has not agreed to do so.  And the Court would agree that the parties' CBA seems to expressly exclude the Union's

two grievances from arbitration. But the principle annunciated by the Supreme Court in *AT&T Tech*. came from a series of cases known as the *Steelworkers Trilogy*.[7] *See AT&T Tech., Inc.,* 475 U.S. at 648. All three of the *Steelworkers* cases, like *AT&T Tech.*, were brought under the LMRA—not the RLA. In reaffirming the principles announced in the *Steelworkers Trilogy*, the Supreme Court observed that they "have served the **industrial relations community** well" and that there was "no reason . . . to question their continuing validity . . . ." *Id.* (emphasis added). The RLA does not apply to the industrial-relations community, rather, it applies to the rail- and air-transportation industry. *See e.g. International Brotherhood of Teamsters, Chauffeurs, Warehouseman & Helpers of America-Airline Division and Teamsters Local 19 v. Southwest Airlines,* 875 F.2d 1129, 1135-36 (5th Cir. 1989)(recognizing difference between National Labor Relations Act and RLA and stating, "we are not certain that this rule of construction applies identically to the RLA").

Congress enacted the RLA to provide a comprehensive framework for the resolution of labor disputes in the rail- and air-transportation industry. *See Atchinson Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 562-63 (1987). This framework seeks, among other goals, "to avoid any interruption to commerce or to the operation of any carrier engaged therein; . . . to provide for the prompt and orderly

---

[7] These cases are: *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 674 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960); and *Steelworkers v. American Mfg. Co.,* 363 U.S. 564 (1960).

8

settlement of all disputes concerning rates of pay, rules, or working conditions; [and] to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."  45 U.S.C. § 151a.

The RLA regulates three types of disputes: *representation disputes*, *major disputes*, and *minor disputes*.[8]  *See Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252 (1994); *Independent Association of Continental Pilots v. Continental Airlines,* 155 F.3d 685, 690 (3rd Cir. 1998).  A major dispute involves the formation or the existence of a CBA seeking to govern rates of pay, rules, and working conditions of employees of an air carrier.  *Continental Airlines, Inc. v. International Brotherhood of Teamsters,* 391 F.3d 613, 616 (5th Cir. 2004).  "These disputes arise when it is alleged that a CBA is not in place, or when a party seeks to change the terms of an existing agreement . . . ."  *Id.* at 617.  The issue, therefore, "is not whether an existing agreement controls the controversy."  *Burley,* 325 U.S. at 723.

If the dispute between the carrier and its employees is a major dispute, the RLA requires that they maintain the status quo and bargain over the issue, and they must exhaust the lengthy mediation procedures set forth in the RLA before either side may resort to self help (i.e.

---

[8] Representation disputes are disputes concerning the selection of collective-bargaining representatives.  Because they are not in issue here, the Court will not discuss them.

strikes or lock-outs). *Independent Association of Continental Pilots*, 155 F.3d at 691; 45 U.S.C. § 156. "Compliance with these requirements is enforceable in the federal courts." *Independent Association of Continental Pilots*, 155 F.3d at 691, citing *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 149 (1969); *see also Southwest Airlines,* 875 F.2d at 1133 ("Until these preliminary steps are exhausted, unilateral action can be enjoined.").

While a major dispute arises out of efforts to secure or change the terms of a CBA, a minor dispute arises "'out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'" *Continental Airlines, Inc.,* 391 F.3d at 617 (quoting *Consolidated Rail Corp v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302-03 (1989)). Thus, a minor dispute

> contemplates the existence of a [CBA] . . . or . . . a situation in which no effort is made to bring about a formal change in terms or to create a new [CBA]. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.

*Eglin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 723 (1945). The pivotal feature that distinguishes a minor dispute from a major dispute is that the minor dispute can be conclusively resolved by interpreting the existing CBA. *See Consolidated Rail Corp.,* 491 U.S. at 305.

"Under the RLA, minor disputes must be resolved through binding arbitration before an adjustment board established by the union and

10

the employer." *Continental Airlines, Inc.*, 391 F.3d at 617; *see also Parker v. American Airlines, Inc.*, 516 F. Supp. 2d 632, 635 (N.D.Tex. 2007)(Means, J.) ("The RLA . . . establishes a mandatory arbitral mechanism for resolving disputes 'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'")(quoting *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 248 (1994)). Minor disputes may not be the subjects of strikes or lockouts.[9] *See Independent Association of Continental Pilots,* 155 F.3d at 691; *International Association of Machinists & Aerospace Workers, Airline District 146 v. Frontier Airlines,* 664 F.2d 538, 541 (5th Cir. 1981)("strike action interrupting commerce is precluded by the statutory scheme"). "Jurisdiction to entertain the merits of a minor dispute rests exclusively with the arbitral forum: 'Congress considered it essential to keep these so-called minor disputes within the Adjustment Board and out of the courts.'" *Independent Association of Continental Pilots,* 155 F.3d at 691 (quoting *Union-Pacific Railroad Co. v. Sheehan,* 439 U.S. 89, 94 (1978)(per curiam)).

Thus, the RLA "establishes mandatory procedures for the resolution of both major and minor disputes." *Continental Airlines, Inc.*, 391 F.3d at 617. Depending on the type of dispute involved, the RLA

---

[9] This was born out of an agreement between labor and the carrier that all minor disputes must be submitted to an arbitral board (if the grievance procedure failed to resolve the dispute) in exchange for the decision of the arbitral board being final, binding, and judicially enforceable.

"imposes different procedural requirements on the parties and prescribes different dispute-resolution fora." *Independent Association of Continental Pilots*, 155 F.3d at 690. These procedures cannot be abrogated by a CBA.

Soon after deciding the *Steelworkers Trilogy,* the Supreme Court issued its opinion in *International Association of Machinists, AFL-CIO v. Central Airlines, Inc.,* 372 U.S. 682 (1963)—a case brought under the RLA. In that case, the Supreme Court stated that it is the RLA that determines "whether the contractual arrangements made by the parties are sufficient to discharge **the mandate of [section] 204 and are consistent with the Act and its purposes. It is federal law which would determine whether a [section] 204 contract is valid and enforceable according to its terms**." *Id.* at 691 (emphasis added).

In coming to this conclusion, the Supreme Court recounted the history and purposes of the RLA.[10] *See Id.* at 686 ("The obligation [that section] 204 fastened upon carriers and their employees cannot be read in isolation. Its true significance must be drawn from its context as part of the [RLA], which itself draws meaning from its history."). As previously mentioned, Congress enacted the RLA to minimize interruptions in the nation's transportation services, and to achieve its goal, it established a mechanism for the resolution of major and minor disputes between carriers and employees designed

---

[10] A detailed recounting of this history is contained in *Eglin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711 (1945).

to minimize or eliminate strikes and lockouts.  When Congress amended the RLA in 1936 to extend its coverage to the then infant air-transportation industry, it extended "to air carriers and their employees the same benefits **and obligations** available and applicable in the railroad industry."  *Id*. at 685 (emphasis added); 45 U.S.C. § 182.

"The duty imposed upon the [carriers and its employees] to create adjustment boards to settle grievances was more than a casual suggestion . . . ."  Central Airlines, Inc., 372 U.S. at 686.  The law made it "compulsory," and the air industry was "placed under the statutory duty of establishing **and utilizing** system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes arising under existing contracts."  *Id*. (emphasis added).  Moreover, the Supreme Court stated that "the provisions of a [section] 204 contract . . . are to be judged against the [RLA] and its purposes **and enforced or invalidated** in a fashion consistent with the statutory scheme."  *Id*. at 694 (emphasis added).

The United States Court of Appeals for the Third Circuit followed this same reasoning in *Capraro v. United Parcel Service Co.*, 993 F.2d 328, 336 (3rd Cir. 1993).  There the court of appeals held:

> As we have earlier noted, the grievance and arbitration process **is not optional** under the RLA.  Congress intended the RLA's procedures, particularly the Adjustment Boards, to be the exclusive means of dealing with minor matters involving the interpretation of a collective-bargaining agreement and for all aggrieved

13

> employees to have access to such procedures. It necessarily follows that an employer and a union, through a negotiated collective-bargaining agreement, cannot deprive a category of employees of access to the grievance and arbitration process. **Thus, if the collective-bargaining agreement here is read to deny such access, the relevant clauses, to that extent, are invalid and unenforceable.**

*Capraro,* 993 F.3d at 336-37 (emphasis added). The obvious import of *Capraro* is that the RLA reflects a clear congressional decision that minor disputes are to be arbitrated—not litigated.

Applying *Central Airlines, Capraro,* and the RLA (as well as the RLA's history and purposes), the Court concludes that Congress has required all air carriers and its employees falling under the RLA to establish a system, group, or regional board of adjustment that shall have jurisdiction to hear and decide all minor disputes. The dispute-resolution fora for minor disputes are the only permissible mechanisms to resolve minor disputes. *See Union Pacific Railroad Co. v. Sheehan,* 439 U.S. 89, 94 (1978)("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts ."). Minor disputes cannot be litigated and decided in the courts and the decision of the board of adjustment is final, binding, and legally enforceable.[11]

---

[11] It should be noted that the courts are permitted only a very narrow review of the decision of a board of adjustment. "Specifically, judicial review is limited to (1) whether the Board failed to comply with the RLA; (2) whether the Board failed to conform or confine itself to matters within the scope of its jurisdiction; and (3) whether the Board's decision was the result of fraud or corruption." *Continental Airlines, Inc.,* 391 F.3d at 617. A district court is prohibited from second guessing the board or applying its own construction of a CBA.

Reviewing the dispute here, the Court concludes that the Union's grievances involve minor disputes because they concern the interpretation and application of an existing CBA between the parties. This is because "the existing [CBA] affords some arguable basis for" CareFlite's firing of Hilton and the Union's grievances. *Southwest Airlines Company,* 875 F.2d at 1133. Put another way, there would be no way for the Court to decide the Union's grievances without interpreting and applying the parties' CBA.

Furthermore, it is of no moment whether the Union's grievances can be considered frivolous or whether it may seem obvious that under the express terms of the CBA Hilton would not be entitled to any relief. In deciding whether the parties must arbitrate their disputes, the Court "is not to rule on the potential merits of the underlying claims." *AT&T Tech., Inc.,* 475 U.S. at 649. But while the CBA can limit employees' substantiative rights, *see Capraro,* 993 F.2d at 335 ("we agree . . . that the [CBA] can limit a probationary employee's substantive rights . . . and thus leave a discharged probationary employee without much to argue . . . before the arbitrator"), it cannot limit employees' procedural right to have minor disputes arbitrated—"the grievance and arbitration process is not optional under the RLA." *Id.* at 336. The arbitration remedies under the RLA "'were intended by Congress to be the complete and final means for settling minor disputes.'" *Brotherhood of Locomotive Engineers v. St. Louis Southwestern Railway Co.*, 757 F.2d 656, 659 (5th Cir. 1985)(quoting

*Brotherhood of Locomotive Engineers v. Louisville and Nashville Railroad Co.,* 373 U.S. 33, 39 (1963)).

III. Conclusion

Therefore, the Court concludes that the Union's grievances are minor disputes subject to the mandatory and binding arbitration procedures laid out in the RLA. To the extent the parties' CBA attempts to exclude the Union's grievances from arbitration, it is unenforceable. Accordingly, CareFlite's motion for partial summary judgment is DENIED and The Union's motion for summary judgment is GRANTED.[12]

SIGNED July 30, 2008.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[12] In rendering this decision, the Court expressly declines to follow *Texas International Airlines, Inc. v. Association of Flight Attendants,* 498 F. Supp. 437 (S.D.Tex. 1980).